UNITED STATES DISTRICT COURT WESTERN DISTRICT WISCONSIN

Matthew La Brec,
    Plaintiff,

v.                         Case No. 22-cv-258-jdp

Michael Glass,
Ryan Blount,
Larry Fuchs,
Dontaeva Acklin,
Armon Myadze,
Angel Genman,
Shannon Hubele,
Sergeant Bender,
Kyle Ferstl,
Francis Balderston,
    Defendants.

## CIVIL RIGHTS COMPLAINT UNDER 42U.S.C. §1983 WITH SUPPLEMENTAL STATE LAW CLAIMS UNDER WISCONSIN LAW

1. This is a civil action authorized by 42 U.S.C. §1983 to redress the deprivation under color of state law, of rights secured by the U.S. Constitution. This Court has jurisdiction under 28 U.S.C. §1331 and §1343(a)(3), and supplemental jurisdiction under 28 U.S.C. §1367 for State law claims.

2. This Court is an appropriate venue under 28 U.S.C. §1391(b)(2).

### I. PARTIES

3. Plaintiff, Matthew L. La Brec, was at all times relevant to the events described herein confined at the Columbia Correctional Institution(CCI), in Portage, Wisconsin.

4. Each of the defendants are being sued in their individual and official capacities.

5. Defendant Michael Glass was at all times relevant to this complaint a Corrections Program Supervisor(CPS), in charge of the Restrictive Housing Units 1 and 2(RH-1 and RH-2) at CCI by the Wisconsin Department of Corrections(WIDOC), this includes the implementation, crafting and troubleshooting of policies and procedures in the administration of RHU's, as well as investigating misconduct on behalf of officers working on the units as the first line in the chain of co-

1

mmand.

6. Defendant Ryan Blount was at all times relevant to this complaint the Security Director at CCI, employed by the WIDOC. He was in charge of the crafting, implementing, and enforcement/compliance with all institution rules, regulations, and policies, as well as the implementation of Division of Adult Institutions(DAI) policies to the CCI. He was also responsible for the overall administration of the RH Units, and the staff who work on them, in coordination with the Restrictive Housing CPS, and Administraitive Captain.

7. Defendant Larry Fuchs was at all times relevant to this complaint the Warden at CCI, employed by the WIDOC. He was responsible for safety of all inmates at the institution, the duties described in ¶¶5-6 concerning policies, as well as being the Reviewing Authority for both complaints filed in relation to this action, and in prime position to notice and rectify a systemic deficiency in CCI.

8. Defendant Dontaeva Acklin was at all times relevant to this complaint a Correctional Officer(CO) at CCI, employed by the WIDOC. She was responsible for the safety and security of the unit she is deployed to.

9. Defendants Armon Myadze, Angel Genman, Shannon Hubele, and Francis Balderston, were at all times relevant to their actions in this complaint CO's at CCI, employed by the WIDOC. They were responsible for the safety and security of the unit they were deployed to.

10. Defendants Kyle Ferstl and Sergeant Bender were at all times relevant to their actions in this complaint Correctional Sergeants (Sergeant or Sgt.) at CCI, employed by the WIDOC. They are responsible for the overall safety and security of the inmates and staff assigned to the post they supervise, and are trained to specifically memorize personal characteristics of a large number of the residents at the institutions, in order to identify and communicate any irregularities to their medical, mental, or physical being to the proper staff.

## II. STATEMENT OF FACTS

12. In February of 2021, I was taken to RH-1 and placed on Temporary Lock Up(TLU) status, pending disciplinary action for contraband. (initially there were other allegations, but I was found guilty of having a razor blade that I intended to use to kill myself should my criminal appeal fail).

13. Historically when I am removed to RH, or am already there, my behavior slowly but surely deteriorates to actions including but not limited to self-harm,

2

suicide attempts, damage to property, assault, and almost always have an initial period where about a week and a half to three weeks of difficulty adjusting to the constant confinement.

14. On February 8th or 9th(I am not sure which day it was), I showed Defendant Genman a staple, and told her I was going to cut myself. Genman did nothing when I refused to give it to her, and she left the tier.

15. I cut myself some that day, but stopped myself by using coping skills, and I state this to show that Genman had prior knowledge of the fact that I had a method in which to harm myself prior to 2/10/2021.

16. On 2/10/2021, at approximately 12:45pm, I covered my window, along with my neighbor, inmate Christopher Reed, and when Genman was placing another inmate in the shower, I yelled down the tier that both me and Reed were cutting, and our windows were covered.

17. Genman finished putting the other inmate into the shower(at the opposite end of the tier from my cell), and then came down to the cells of me and Reed.

18. She first attempted to get Reed to take down his cover, when he failed to respond at all, she moved to my door and attempted to get me to respond, when this also failed due to me not responding, she left the tier, and never came back to check on me again.

19. After second shift started I uncovered my window and told myself to try again to get their help in order to prevent myself from harming myself.

20. I asked Balderston to tell PSU that I needed to talk to them because I wanted to self-harm, he told me he would see if they would see me. It should be noted Balderston was assisting with showers and unit rounds when he was assigned as the Clinical Observation checker, meaning his sole job that shift was to monitor inmates placed on observation(OBS), placing them at risk during his absence.

21. The more time went by, the more I became upset, and after I was removed from my shower I told Balderston that I am tired of waiting and being ignored and that I was going to give them, meaning RH-1 staff, to the count of three hundred to go and get help or I was going to cut myself.

22. He said he was going to go tell the Sergeant, who was defendant Ferstl, Balderston did not return for well over the stated time limit, and it should be noted that the Sergeant was only a short, approximately 50 foot walk from my cell door. This is when I began to cut myself.

23. Sometime later defendants Myadze and Acklin came to pass out meal trays and I told them I was going to kill myself(at this time I already had an open wound on my Left arm), they acknowledged my statement with simple statements of

3

acknowledgment that made me doubt whether they were going to report my statement to anyone. I can't remember the exact words but would have been something like a simple "okay", but I do remember that they did not say whether they were going toreport this at first.

24. I then told Acklin that she needed to tell someone else besides her sergeant in the event that he failed to contact the appropriate staff to respond to my intent.

25. Acklin replied that the only thing she could do was report it to her sergeant. I then explained to her that that was wrong, and that she had a duty to go above him if he was failing to do his duty in response to something she told him when an inmate tells her they are going to kill themselves, not in an ambiguous manner but with a present tense statement that "I am going to kill myself. She again said that she couldn't do anything but tell her sergeant.

26. Defendant Ferstl was the sergeant assigned to RH-1 on 2/10/2021 from 6:00am to 6:00pm, and was the person that defendants Balderston, Genman, Acklin and Myadze would have initially reported my reports of intent to cut and kill myself to.

27. Due to the unknown of whether Genman, Myadze, or Acklin ever reported my words and actions to Ferstl I ask the court to construe my claims liberally that either 1) These three defendants never reported these things to him, and are therefore liable; and/or 2) they did report them, and Ferstl did nothing, in which case they would be liable for their failure to go directly to someone else who would have contacted another member of security to take action, or even a psychologist directly.

28. I ask that the court screen these claims to be both allowed to proceed, in the understanding that after I pursue discovery, I will be able to find out which of these events took place.

29. Balderston is a different story, as he repeatedly came back and told me he told the sergeant, and therefore knew that I had not been seen by Psychological Services Unit(PSU) staff due to my repeated requests, and therefore knew that either Ferstl didn't contact PSU, or he did, and PSU was not taking action, either way, he had a duty to then take further action in order to protect me from myself.

30. Accordingly, I ask the court to construe liberally that either upon hearing reports from either Balderston alone, or possibly also Genman, Myadze, and Acklin, Ferstl took no action, and let me be unsupervised after reporting my intent, or only Balderston told him, albeit more than once, and he did nothing.

31. I do know that Ferstl did in fact tell PSU that I was requesting to see them(it should be noted that at the times relevant to this complaint, Dr. Dan Norge was the assigned PSU staff to RH-1). I know this due to Norge telling me that Ferstl told him only "That you were requesting to see me." Norge told me Ferstl definately did not tell him I was going to cut and kill myself.

32. Norge also told me that Ferstl told him this as he was leaving the RH-1 control bubble to leave for the day, and that they should tell me he would see me the next day. He went on to explain had anyone told him of my reports of intent to cut and kill myself, he would have seen me that day. It should be noted that no one told me anything about Norge seeing me the next day, and the conversation in ¶¶31-31 between me and Norge happened while I was in Observation status the day after I cut myself.

33. Ferstl had an extensive knowledge of my history, including serious self-harm/suicide attempts, along with other things such as assaultive and disruptive behaviors. Ferstl would also know due to a multitude of past incidents, that when I say I'm going to cut or kill myself, then it's not something that can be pushed off, as if I could handle it without OBS, then I do so. The very fact of me actually reporting it is a guarrantee that the action is imminent.

34. Ferstl only telling Norge that I wanted to see him would cause Norge to believe this was a general request. Upon information and belief, due to past experience with Norge, and his own statement to me, had Ferstl communicated the correct information to him I would have been seen immediately, or even placed on OBS overnight until I could be seen the next day.

35. At approximately 4:30-4:50pm(time varies in incident reports), Officer Balderston saw the blood smeared on my window cover, and went to report it to Ferstl.

36. Ferstl then came out of the bubble and to my door, when I heard other inmates yell out that he was on the tier, I uncovered my window, and continued to rip at the cut in my arm with my fingers. I had cut myself with a staple, but I concealed the staple in my mouth, and made the grout I had removed from my cell be covered in blood, so that I could keep the staple.

37. Ferstl then activated his radio to call for support, and they tried to get me to come out of my cell, but I refused, stating I would comply as soon as a "white shirt" came. It should be noted there was already a significant amount of blood on my floor, as I was already bleeding for about 10 minutes before Balderston came and saw the blood on my window cover.

38. Later that night, at approximately 6:50pm, I once again opened the wou-

5

nd after repeated attempts to get help due to the Security Kilt I had been provided being contaminated with OC spray(Mace), and it causing my genitalia and general area between my waist and knees in front and back to burn.

39. After being told for an extended period that they were trying to get permission from on-call PSU to give me a decontamination shower, I told them I was going to reopen my wound. By them I am referring to Balderston, who was still assigned as OBS checker until 10:00pm.

40. I ultimately reopened my wound, and lost more blood, causing the Nurse to once again have to close the wound. While I was out for this I also spoke to Shift Supervisors about why my property was being removed from my cell, as CPS Glass told me it would remain in my cell, which I would return to once my OBS placement was lifted. There were no further self-harm incidents after this, and the next day I spit the staple out in my toilet and Norge flushed it for me when he said he would advocate for me to get off OBS due to the severity of the cold that was present in the OBS area.

41. During my initial nursing treatment I spoke to Glass concerning the events of that day, and the fact that I had been asking for help all day, and telling staff of my intent to cut myself, and kill myself, and that nothing was done to help me.

42. Glass assured me he would "look into it" and I advised him that almost every encounter would've been captured on body cameras worn by the staff on unit that day. He told me he would take care of it.

43. I submitted Interview/Information Request form to Ms. Szelagowski on 2/16/2021, and informed her that I wanted Body Worn Camera(BWC) footage, as well as hardwired tier footage(written in ink after I had already removed the form from my typewriter) preserved, and stated that I intended to use it for future litigation purposes.

44. The request was forwarded to Robert Beahm, who on 2/22/2021, replied that my request had been forwarded to "Security for review and retention".

45. The Inmate Complaint Review System(ICRS) Institution Complaint Examiner (ICE) on 3/18/2021, stated that he viewed multiple video footages, and based his decision off of snapshots of footage, none of which seem to be from the dinner meal pass out from the BWC's of Acklin and Myadze, ending at 2:59pm, a full hour to an hour and fifty minutes before staff responding due to my significant self-harm.

46. In all incident reports written by responding officers(conspicuously absent are any reports filed by ANY defendant besides Ferstl) there is language

stating that BWC footage was downloaded and saved. The very absence of any incident reports by Balderston, Genman, Myadze, or Acklin is suspicious, as they all had personal involvement with the incidents, but I know for certain that Acklin and Myadze both had actively recording BWC's at the time they passed out meals, as I saw both the red and green lights on on their cameras, and in fact I told one of them to turn theirs on, as they were interacting with inmates. I believe that was Myadze. So the fact that the footage is not mentioned for after 2:59pm when I told them I was going to kill myself is suspicious considering the overall circumstances.

47. On 4/20/2022, I requested the BWC footage for the above described incident, pursuant to Wisconsin Public Records law, to which Robert Beahm replied the footage did not exist. It should also be noted that I requested that the Department of Justice contact CCI and tell them to preserve the footege in the notice of injury and claim form I filed with WIDOJ by certified mail in June,2021.

48. On 4/1/2021, I was once again held in RH-1 on TLU status, when the following events occured, I was housed on A-Lower Tier Cell#1, directly in front of the control bubble. I could even see into the bubble from my cell window.

49. At the 1:30pm RH-1 "pipe round", Genman came on the tier, and I told her that I was "having thoughts", to which she replied "I'll let them know". She then exited the tier, and I did not see her for the rest of her shift.

50. I would like to note that normally someone stating "I'm having thoughts" is not enough to state a claim, but upon my experience at CCI, it is generally understood that this phrase is meant to intend self-harm/suicidal ideation, I further allege upon information and belief that Genman knew this, because she did not seem confused, ask any questions, or otherwise indicate her misunderstanding of my meaning, she acknowledged me and assured me that she would let "them" know, which I understood to mean either her Sergeant(Bohnsack) or PSU staff directly.

51. She also worked while I was on Observation from the 2/10/2021 incident, and therefore had requisite knowledge of not only my past communications, but the follow through in which I significantly self-harmed. Bohnsack later told me that Genman never informed him of my statement, and that he would have responded if she had due to my history.

52. On Second Shift which began at 2:00pm, defendants Acklin, Myadze, and Hubele were the officers working the "floor" as the unit operations staff call it, and Defendant Sergeant Bender was the unit sergeant starting at 6:00pm.

7

53. Between 2:00 and 6:00pm, Sergeant Bohnsack got me out of my cell to talk to me and he said he was going to see if a PSU worker was going to see me the next day, and would send an email to make sure I was seen. It was at this time that he informed me that Genman did not inform him of my earlier statement.

54. Later in the shift, I told Acklin that I was going to cut myself, and that I wanted a white shirt. She said she would tell the Sergeant. She came back later and I asked her if she told the sergeant and she said yes, but that he said they weren't going to call the white shirt.

55. I then attempted to get help from Myadze and Hubele in the same way, by telling them I was going to cut myself, and looking very upset, at times I was yelling and swearing and being very disruptive, kicking the door and showing very unstable behavior.

56. Myadze said he would go ask Bender if he would call the white shirt. While he was gone, I tried to ask Hubele to call the white shirt for me, telling her that I knew Bender and that he wasn't going to call, and that she had a duty to help me even if her sergeant wasn't going to.

57. I then showed her a large piece of grout that I told her I would use to cut myself if I wasn't given help. Shortly thereafter, Myadze came back, and I also showed him the grout, and told him I would use it to cut myself with, and to call the white shirt. He told me "No one is calling the white shirt."

58. I then headbutted the door extremely hard, to where I felt an electric type shock shoot down my arm and into my right hand. I then began to scream at them, Acklin and Myadze, and tell them they needed to call the white shirt or I was going to keep on hurting myself, they did not do anything to get me help, or to stop me from further harming myself, after seeing my headbutt the door.

59. I then used the grout to slash across my neck in front of Hubele, and Myadze or Acklin(I know Hubele was one of them, but unsure which of the other two witnessed this initial neck slash). When Hubele saw this, she took off running, and I heard her go into the control bubble(the door is very loud).

60. Upon information and belief she went to go tell Bender, who at this point was duty bound to once again to call a white shirt. They once again told me that no white shirt was going to come.

61. At some point between the headbutt, initial neck slash, and my later neck cutting, I spoke to Acklin, and tried once more to plead with her to get me help, as she should know my actions were sincere, being that she witnessed the time less than 2 months prior when I significantly self-harmed, causing loss of a lot of blood,

62. Acklin told me she did not have any experience with me prior to this day self-harming, and I again reiterated that I needed help, and that she saw how the situation ended the last time. She said she couldn't do anything to help me.

63. I then covered my window, and stopped talking to staff, who willfully ignored the other inmates I heard telling them they needed to check on me, and that I said I was going to cut my neck open.

64. I tthen used a staple, and started to cut my neck open, over a period of about 2 hours. During this time, there was an inmate on the A-Upper tier, who was removed from his cell in order to speak to a white shirt, at this time any of the defendants Hubele, Acklin, or Myadze could have told the supervisor that I had made threats and acts of self-harm, and that Bender was refusing to call the white shirts, upon information and belief, none of them did this, as I was not assessed, nor placed in OBS.

65. Later that same night, at "HS" or bedtime medication pass, I showed Acklin, Hubele, and Myadze my neck cut, to which they uniformly showed indifference, and simply asked if I wanted my medication. I became very upset started screaming and yelling and calling them names, and kicking my door, Acklin then told me I wasn't getting my meds because of this.

66. It should also be noted that when I showed Acklin my neck with a already significant cut on it(subsequent to the cutting I did when I covered my window in ¶63 above), she shrugged her shoulders, and stated, "I didn't make you do that."

67. At the end of second shift defendants Acklin, Myadze, and Hubele left the RH-1 unit, and Sgt. Bender stayed on until 6:00am(the Sergeants work 12 hour shifts from 6:00am to 6:00pm but Officers work 8 hour shifts).

68. During 3rd shift, CO II Lavia did rounds, and I had my cell window covered all night, he just shined his flashlight at my window, and never saw me, I even told him I had cut my neck, and had a "red smile" on my neck. He did not respond to this, and I had my window covered all 3rd shift, during which I continued to cut my neck, and only stopped because some of the guys on my tier went out of their way to talk me down.

69. The next morning the unit regulars CO Dickrell and Broyles were working, and when Broyles came to my cell door with the nurse to administer my Health Services Unit(HSU) controlled medication, he saw the cut across my neck from my door window before I ever even got out of my bed where I had been laying on my back, in anticipation of this moment, where I knew I would be able to get some

9

medical treatment.

70. Later on in the morning of 4/2/2021, I forced RH-1 staff to have CPS Glass talk to me, during this time I talked about the incident that happened on 4/1/2021, and on third shift, and I explained to him that I was going to be filing an inmate complaint about the situation. I told him I was going to let the ICRS know that I had already followed the chain of command, and just file it since we were done discussing the incident. He replied that that would be fine.

71. Glass then assured me that he was going to look into the events, and "take care of it" and assured me he was going to watch the BWC footage.

72. On 4/6/2021, I wrote an Interview/Information Request(DOC-643), to the "Security Secretary" (I thought it was Ms. Szelagowski, but she was no longer in that position) in which I requested they preserve specific BWC footage, and the "hardwired" tier camera for the A-Lower tier for the date of 4/1/2021 through first shift on 4/2/2021, this was received on 4/08/2021, replied on 4/29/2021.

73. On 4/14/2021, I wrote another DOC-643, addressed to Ms. Szelagowski, as I had not received any response to my first one, in this I stated that it was my second request, and restated the camera footage that I wanted preserved. This DOC-643 was received on 4/16/2021, and was responded to on the same day, stating that, "the video is retained".

74. I also wrote in my notice of injury and claim form filed with the WIDOJ that I wanted them to contact the CCI, and tell them to preserve the video, filed in August, 2021.

75. I submitted an Open Records request to the records supervisor on 4/6/21 in which I requested the incident reports written for both incidents contained in this action, and while I received some for the 2/10/2021 incident, they replied that none existed for the 4/1/2021 incident.

76. Defendants Fuchs, Blount, and Glass all hold positions where they have the authority, as well as the responsibility, to craft, enact, and enforce policies, rules, and regulations.

77. Blount, being the Security Director, would have knowledge of incidents of inmates commiting acts of self-harm and suicide while housed in RH-1 and 2, as he has direct supervision of these units in coordination with CPS Glass and Warden Fuchs, and is generally copied in on incident reports written for this.

78. Blount was in fact involved in all the incident reports submitted for the 2/10/2021 incident, as each one was submitted to him for review, and "Security Director/Regional Chief Comments" where he can state further action to be taken, or copy in other staff, etc.

79. Glass was consulted by me on both occassions, and failed to take any action regarding staff misconduct, and in fact, Acklin is now a regularly assigned officer in the RH-1, where the vast majority of self-harm/suicide attempts actually happen, notwithstanding RH-2, which Blount and Glass also are in direct administration of.

80. CCI has a long standing history of systemic issues pertaining to inmates self-harming/attmpting suicide, where they inform staff that they need help and staff turn a blind eye to their pleas, and actions. There is an unwritten, widely accepted policy at CCI of not punishing staff who commit the civil right infractions alleged in this complaint, and it is one proven time and time again by the fact that it doesn't change when new administrators are placed in the position with the ability to enforce staff action.

81. Glass having full knowledge of the systemic failure to protect inmates in RH-1 and RH-2 from self-harm/suicide is liable under Monell v. New York City Dep't of Social Services, 436 U.S. 658(1989), as well as Blount, who also turned a blind eye to staffs systemic failure to protect.

82. Fuchs, who as Warden is the Reviewing Authority under the ICRS on most inmate comlaints regarding this systemic failure would be in prime position to recognize and correct such a dangerous practice to continue on such a widespread and systemic level, instead he coopts with other CCI staff in a conspiracy to cover up these violation by destroying videos, photos, allowing staff to not write incident reports, and a general lack of discipline when staff obviously fail in their duties.

83. There exists a conspiracy of silence at CCI to not acknowledge these types of incidents, not reporting them to madison pursuant to DAI policy in order to not come under scrutiny of the wrong people in Madison Central Office, or other agencies that will hold CCI accountable for their actions. The failure to document, report, and correct these incidents, as well as discipline the actors who commit these violations is also in order to avoid the indica of liability being attached to the person who is disciplined, or who disciplinary action is commenced against.

84. The facts alleged for the 4/1/2021 incident constitute a Felony under Wisconsin State Law, as seen in my Notice of Injury and Claim Form, Abuse of residents at a Penal Facility, and had these administrative superiors taken action against Acklin and Myadze for the 2/10/2021 incident, that there is no longer video of, the incident on 4/1/2021 very likely would not have happened.

85. For Fuchs, Blount, and Glass to fail to take these actions described,

11

gives these bad actors tacit approval for their behaviors, and then these same bad actors in turn indoctrinate new recruits to have the same indifferent, malicious conduct toward the safety and life of the individuals in their care, and insidiously corrupt them to where they are part of this conspiracy of silence; that the new recruits are pressured by fear of retaliation, berating, poor job performance reviews, and good old fashioned peer pressure.

86. Fuchs being involved in the ICRS process includes the ability to correct the attempts by the Complaint Examiners and Complaint Examiner Assistants to improperly conduct the ICRS process in order to use Affirmative Misconduct to pare down the amount of issues that people actually get into court, by their abuse of the PLRA. There are classic examples of this affirmative misconduct that I attempted to have Fuchs correct, but true to his guns, he rubber stamps the forms in his staff's favor. I look forward to Defendant's Exhaustion motion where I will be able to expose this behavior.

87. Notwithstanding the efforts by Corrections Officers and Supervisory staff to conceal their callous involvement in egregious acts of self-harm, defendants Fuchs, Blount, and Glass are all three Administrative Supervisory officials with powers to investigate, correct, and promulgate policies, practices, and customs abridging the rights of those under their care, would still have been aware of **each and every major** act of self-harm, as notification redundancies exist that make it near impossible for line staff to completely conceal these incidents and the questions they raise.

88. For example, and particularly specific to my allegations at ¶¶14-71, relating to officers Acklin, Myadze, and Balderston; in ¶35 Balderston notified Ferstl that my window was covered, with paper that had blood all over it, Ferstl responded and later wrote an Incident Report in which he reports Balderston did notify him, however he fails to mention that the window was covered with paper that was smeared with blood, despite there being BWC footage, video footage from other cameras(I assume a handheld camera but will not know until I receive it), and photos of all the items taken from the cell, as well as the appearance of the cell before they entered.

89. All staff involved in the incident were <u>required</u> to submit Incident Reports per WIDOC policy. However, Balderston, Acklin, Genman, and Myadze could not submit reports as that would have caused them to admit their deliberate indifference, or try to conceal it and hope no one notices the fabrications and inconsistencies between the reports and the BWC footage, they chose not to write them, and now there is doubt whether any footage survived.

90. Defendants Fuchs, Blount, and Glass, who reviewed Ferstl's Incident Report, would have all been aware that 1) There were BWCfootage and footage from the tier camera that would have provided a more comprehensive picture of events; 2) There were no incident reports written by any unit staff who would have interacted with me leading up to Ferstl's interaction with me.(indeed, they would have noticed not only that Balderston was mentioned in Ferstl's report as reporting I was threatening self-harm, and my window was covered, but then that Balderston violated DOC policy by not documenting this in an Incident Report of his own.)

91. As explained above, these defendants(Fuchs, Blount, and Glass) intuited that the only reason an entire unit of officers would conceal their involvement would be to deep-six said involvement and any cross-references to BWC's that would show their actions should the reports be written, and the BWC footage surface. Fuchs, Glass, and Blount's failures in correcting this caused them to get away with violating policy, and my civil rights, making it so that these officers were not afraid to continue these types of dangerous behaviors, as they knew they would not be punished.

92. Additionally, by acquiescing to such violations of civil rights, these defendants have allowed officers like Acklin to remain an officer in RH-1, where instances of self-harm/suicide are vastly increased, and less than two months later Genman, Acklin, and Myadze committed the same behaviors again with me.

93. Other avenues of knowledge of the under-reporting of staff involvement in self-harm comes via ICRS notification, which requires RH-1 and RH-2 inmates contact Glass prior to submitting complaints regarding self-harm and deliberate indifference. Glass is thereby apprised, and so is the Warden when he decides complaints as the Reviewing Authority, of the nature and frequency of the alleged indifference of repeat offending officers such as Acklin, Genman, Myadze- yet they have taken no steps to affirmatively investigate and correct these violations, nor establish a way to change the custom or practice itself.

94. Finally, Glass and Blount would have knowledge of these incidents from the Unit Logbook, and also the weekly Restrictive Housing meeting, in which they discuss these and other types of events. The Warden would also likely see these types of incidents logged in the "Daily Shift Report" filled out by the Lieutenant or Captain on duty for each shift.

## III. LEGAL CLAIMS

95. Plaintiff realleges and incorporates by reference ¶¶ 1-94.

96. Plaintiff prays the Court construes his allegations above, and the following Legal Claims liberally.

97. Defendants Dontaeva Acklin, Armon Myadze, Angel Genman, Shannon Hubele, and Francis Balderston, while being employed as Correctional Officers, failed to protect me from imminent self-harm when I told them of my intent, obscured myself from their ability to see me, made them aware I had the means to harm myself, and in some instances actually did harm myself in their presence. These officers did not document or memorialize their interaction in any way, failed to intervene when it was obvious their Sergeant was not going to take action, and otherwise contributed to the conspiracy of silence in place at CCI, to hide the serious problem with the systemic indifference entrenched in CCI relating to the protection of inmates. This is in violation of the 8th Amendment to the U.S. Constitution, Wisconsin Tort law concerning Negligence, and Abuse of Residents of Penal Facilities Wis. Stat. §940.29 which is a class I felony.

98. Defendants Sergeant Bender, and Kyle Ferstl both being employed as Correctional Sergeants who worked in the RH-1 at CCI, failed to protect me from serious self-harm, when they failed to report my intent and seriousness to the white shirt and/or PSU staff, in order to prevent me from harming myself. Ferstl let me languish from a couple hours before first shift was over, approx. 12:50pm, all the way until I was bleeding profusely when he decided to come the short walk to my cell, and discovered that I had lost a significant amount of blood. He failed to ensure that his subordinates wrote Incident Reports, ommitted information from his report, and contributed to the conspiracy of silence in place at CCI. Bender refused to call a white shirt even when multiple staff told him not only was I stating I was going to kill myself, but also that I had already headbutted my door extremely hard, but also begun to cut my neck in front of them. Bender at no point came to see for himself what condition I was in, and disregarded any care for my life or safety. These actions by Ferstl and Bender constitute violation of the 8th Amendment to the U.S. Constitution, and Wisconsin Law Negligence Torts.

99. Defendants Michael Glass, Ryan Blount, and Larry Fuchs, being employed as Administrative Staff were aware of a policy, practice, or custom which has been at play in CCI, and especially the RH-1 and RH-2 units, which turns a blind eye to inmates who state a iminent intention to commit self-harm/suicide, actu-

14

ally commit harm in staff presence, and staff do nothing until either the person needs emergent medical care, or they don't respond at all. They are aware there is a custom of failure to document such incident, whether negligently or maliciously, and contribute to the conspiracy of silence that is implemented at CCI, they fail to discipline staff who commit these violations, and allow evidence of their actions to be improperly destroyed, in order to deprive the injured person of evidence to obtain relief. They fail to change policies, practices, and procedures that would remedy these violations, and fail to remove violators from the ability to repeat these acts, by doing job reassignment, such as to a security tower, visiting room, or other area where they are not responsible for someone's life. These acts and omissions, state a claim under the Monell doctrine, under the 8th Amendment to the U.S. Constitution. Being that Monell claims are complex and nuanced claims to state I ask that the court take particular care with the analysis they conduct in their screening process, and that they construe my claims liberally.

100. Defendant Fuchs, in his position as Reviewing Authority, rubber stamps the Rejection Appeals that are sent to him, completely disregarding the Wis. Admin. Code§310, in making his decisions. He fails to take action to correct these issues when presented to him, and allows the same circumstances to persist even in light of evidence that staff are committing Wisconsin State Felony crimes, and violations of federal civil rights. This also states a claim under Monell, under the 8th Amendment to the U.S. Constitution.

## IV. RELIEF REQUESTED

Wherefore, plaintiff requests that this Court grant the following relief:

A) Declaratory Judgment stating that Defendants' action violated the plaintiff's rights.

B) Issue a permanent Injunction that the WIDOC create a specific database that is for the sole purpose of downloading, saving, and archiving of videos, photos, incident reports, and other materials created due to self-harm/ suicidal actions, or statements.

C) Compensatory damages for plaintiff's physical, and mental harm.

D) Punitive damages against each defendant individually for their wanton, malicious, and criminal treatment of plaintiff.

E) A jury trial on all claims.

F) Plaintiff's costs in this action.

G) Any additional relief this Court deems proper.

## V. VERIFICATION

I have read the foregoing complaint, and hereby certify that the matters alleged therein are true and based upon my own personal knowledge, except as to those matters alleged upon information and belief, and as to those, I believe them to be true. I verify this under penalty of perjury, pursuant to 28 U.S.C. §1746.

*/s/ Matthew L. La Brec*

Matthew L. La Brec

Executed this 7th day of May, 2022 at Portage, Wisconsin.

Matthew La Brec #531236
Columbia Correctional Institution
P.O. BOX 900
Portage, WI 53901-0900